CHARLES McCAUSLAND

*v.*

ROSEVILLE TRUST COMPANY et al.

[Decided June 30th, 1915.]

1. Evidence *Held* to show that when a trust company discounted notes for the payee as endorser and passed the proceeds to his credit, it was under an agreement that the proceeds should not be drawn against pend-

ing maturity of the notes, and that on failure of the makers to pay the notes at maturity, they should be charged to the payee's account, and on the insolvency of the company the payee was entitled to relief by equitable application of securities based on the right to require securities held for the payment of debts to be applied for that purpose.

2. Such special agreement was for the benefit of the trust company, and was valid without a formal approval thereof, by the board of directors, especially where the company had the benefit of the agreement for two and one-half years, and neither the company nor its liquidator in insolvency could repudiate it to the payee's disadvantage.

---

Heard on bill, amended bill, answer, replication, stipulation and proofs.

*Mr. W. Howard Demarest,* for the complainant.

*Mr. Arthur T. Vanderbilt,* for the defendants.

EMERY, V. C.

The substantial issue in this case is one of fact. This question of fact is whether in relation to discounting of certain notes for the complainant, as the endorser thereof, by the trust company, and passing the proceeds to the credit of his account with the trust company, there was in substance an agreement between him and the trust company that the proceeds of these notes should not be drawn against, pending the maturity of the notes, and that at maturity, the notes, if not paid, should be charged to his account.

Complainant, claiming that such agreement as to his deposit account was made in 1910, and was acted on by both parties from about February, 1911, and that upon his part it was always substantially performed, had on deposit with the trust company on August 14th, 1913, the date of its failure, $5,251.55, in which was included the proceeds of the discount of thirteen notes not yet matured, amounting to $1,846.07, endorsed to and discounted by the trust company, and the proceeds of which had not been drawn on, because of the agreement. The trust company is insolvent, and the authorities liquidating it under the statute declined to charge the notes to complainant's account, or

to accept his check on his account for the amount and deliver the notes to him, which would effect substantially a set-off, but insisted on their right to recover the amount of the notes from the makers and leave complainant a *pro rata* creditor for the full amount of the deposit. Complainant's claim on his bill and amended bill is that by the agreement made, the deposit to the extent of the notes discounted was in equity held as security for the payment of the notes, and that under the jurisdiction over the equitable application of securities he is entitled to relief.

Complainant is an insurance agent, or broker, and these notes were notes taken by him from clients in the course of obtaining for them liability insurance. These notes which were made by his clients or customers to complainant's order, represented the amount of payments for premiums to the insurance company, and, as between client and agent, these amounts were paid or assumed by complainant upon receiving the notes. But as the amounts ultimately payable for premiums on such policies were subject to future adjustments, credits on the notes for payments, or otherwise, were arranged between the customer and the agent before the maturity of the notes. Such notes were therefore as between the customers and the agent and in the hands of the agent negotiable securities of a somewhat special character. Complainant, who had not previously taken up or proposed to take up the line of liability insurance, did so in the month of November, 1910, and at that time made an arrangement with Raymond E. Smith, treasurer of the trust company, in reference to obtaining discount on a line of these notes. As to the formal method of discounting the notes, and the legal status of the trust company in taking them, there is no dispute, the evidence of both Smith and complainant being that Smith agreed that when complainant sent the notes in, the notes should be taken and discounted for his credit. They also agree that the discount charged by the bank should be six per cent., and further, that at their interview the allowance to Smith of two per cent. on the balance of his account was spoken of. Complainant says that it was then definitely further agreed between him and Smith, in reference to these notes, that he should not draw on the proceeds of discount of these notes, and that at maturity they should be

charged to his account, and that he was to be allowed two per cent. on his balance. This balance included the proceeds of discount. As between complainant and his clients, the makers of the notes paid the entire discount of six per cent., so that under this arrangement, as stated by complainant, the trust company received four per cent. on the notes, while retaining the money, and complainant received two per cent., besides the incidental advantage of a continuing line of discount, enabling him to carry on this kind of insurance, and also the advantage of prompt collection of the notes by reason of their discount by a *bona fide* holder. Smith's account of the arrangement between them differs from complainant's account. Smith says, first, that according to his recollection there was no other arrangement than that all notes not paid by the makers should be charged to complainant's account. But, in his account of the interview, he further says that complainant made the remark "that the notes he would have discounted for his credit, or placed to his credit, would not exceed at any time his balance in the bank," to which he (Smith) made no comment. As to the interest on his balance, and complainant's request for two per cent. on it, Smith says that he told him that would be referred to the executive committee, as it was not customary in many cases to allow interest on borrowing accounts, and that complainant also mentioned that if at any time any of those notes were not paid at maturity, "I could charge them up to his account," and that he (Smith) told complainant that was customary with all paper of that description, meaning, as afterwards appears by his examination, paper endorsed by and discounted for the customer. Complainant understood the conversation between him and Smith to include on his part a special agreement not to draw against the proceeds of discount pending the maturity of the notes. Smith denies any such special agreement, but the fair conclusion from his evidence is, that he is denying the existence of what he now on the witness-stand calls a "special agreement" on this deposit. Complainant's statement, as admitted by Smith in the course of the negotiations, that the discounts would not at any time exceed his balance, and that the notes if not paid at maturity were to be charged to his account, were material considera-

tions to the trust company, and disadvantages to complainant, and were material terms of the discount being arranged for, and Smith, on the part of the trust company, was entitled to the benefit and to hold complainant to ·them, unless he in some way let complainant understand that he did not hold him to them. Smith, by his silence, accepted or induced complainant to rely on his acceptance of this promise as to the amount of his balances to be left with the company, and. as to the payment from his account at maturity.

In law and equity there was here the mutual consent, evidenced by what the contracting parties said in the interview, and their actions thereon, making an agreement that complainant should not draw on these proceeds of discount and that (subject to approval of the executive committee) the interest of two per cent. should be allowed to complainant on the whole amount of his deposit account. Complainant so understood the agreement and acted on it, and, in my judgment, the proofs show that the trust company also acted as if this agreement had been made and it controlled substantially the status of the account until the failure of the bank. The notes being sent in, the executive committee, through Smith, who had charge of initially discounting them, their discount by Smith was from time to time approved, and interest was allowed at two per cent. on his balance. After the agreement this balance, including the notes, was usually more than double the amount of the notes. Over one hundred notes were discounted after the making of this agreement, or arrangement, and, with the exception of a few days, as to which an explanation is offered, the complainant always kept the notes protected by leaving the amount of the discount in his account. These omissions were not of such a character as to show that on either side the arrangement originally made for security was abandoned or was. not in force at the time of the failure. The only substantial deficit was for a few days in January, 1913, and was occasioned by the transfer from complainant's account to his wife's account with the trust company of the sum of $1,000, which also, by the arrangement between complainant and his wife, was to remain on deposit. For a few days interest at four per cent. on this sum was credited, instead of two per cent., as

it would have been if in complainant's own account. This discounting of notes continued from February, 1911, up to August 14th, 1913.

Mr. Munroe, the attorney of the trust company, and also one of the directors and a member of the executive committee, and the witness whose evidence is entitled to great weight, confirms complainant's statement as to the understanding between the company and Smith in reference to the deposits, and says that the understanding was that at all times complainant would have enough money in the bank to meet the face of the notes, and that if the customers did not take care of them, he would, and that Smith so explained the arrangement to the executive committee and the board. No formal report to either this committee or the board or formal action on this agreement made by Smith with complainant as to the deposits seems to have been taken, and this circumstance perhaps explains somewhat the evidence of two or three other directors at the hearing, that there was no "special agreement" with complainant about leaving the deposits. These directors, or some of them, had previously signed affidavits on the application for preliminary injunction that there was such special agreement, and the difference between the contradictory oaths of these business men probably arises to some extent from what, in their minds, comprised or constituted a "special agreement" at the time of the oaths.

At the hearing, the impression I received from their evidence on this point was, that in denying any "special agreement" relating to the notes, they had chiefly in mind the matter of any agreement which would, to their knowledge, prevent the trust company from holding these notes with the same rights as they usually discounted or purchased notes. That there was any special agreement of that character is not proved, for, as against maker and endorser, the trust company held the notes discounted for value, and there is no proof that such rights were given up. The real question is whether in addition to these general and usual rights which the trust company as a solvent going concern had against the parties to the notes, there was not also a special agreement by which a special security as against the endorser was arranged for on these notes. And I think it is clear, from

the evidence of all these directors who have denied any special agreement, that they all understood, pending the discounts of these notes, that complainant's balances were unusually large, and that this fact was relied on in the discounts. This additional special agreement with the endorser and customer for security was an advantage to the trust company, provided it continued its business, and had the complainant become insolvent or bankrupt, the trust company would have been entitled to hold the deposit as security, to the extent of the notes, against an assignee claiming the whole account. And the fact that the banker instead of the depositor has become insolvent does not change the character of their respective rights in reference to the application of the deposit.

In my judgment, the agreement set out in complainant's amended bill is substantially shown by the evidence to have been made between him and Smith, and afterwards substantially acted on both by complainant and the trust company for the benefit of the trust company and to complainant's disadvantage, viz., that the proceeds of the discount of these notes should not be drawn pending the maturity of the notes, and that upon the failure of the makers to pay at maturity, the notes should be charged to complainant's account.

The objection is made that this special agreement as to the deposits was not formally approved by the executive committee or board, and was not therefore binding on the trust company. Had the agreement been one which in the ordinary course of carrying on its business imposed a burden on the trust company, the objection might have some weight, but the agreement was one for the benefit of the trust company, viz., the securing or arranging security for the payment of notes discounted, and this would seem to be within the ordinary power of the treasurer, who was the active manager (so long as illegal security was not taken), and the formal approval of the board was either not required or would be assumed. But being acted on by the trust company, who have had the benefit of it for two and a half years against the complainant, neither the trust company nor the liquidator in insolvency can now repudiate it, to the complainant's disadvantage.

A decree for complainant will be advised.

The case is disposed of under the equitable jurisdiction based on the right to require security agreed to be held for the payment of debts or obligations to be applied for the purpose, or accounted for, and without considering the mere question of right of set-off, a right not purely equitable in its character. This question was raised at the argument, but not by the pleadings or on the record, and it is a question which appears to be purely a legal question and for the courts of law. It is one upon which courts of law, especially in late decisions, have differed, and it is not now considered.